## PINTSCH COMPRESSING CO. v. BUFFALO GAS CO. NEW YORK TRUST CO. v. SAME. In re CHURCH.

(Circuit Court of Appeals, Second Circuit. April 3, 1922.)

No. 124.

1. **Corporations ⬅476(I)—Mortgage by public utility corporation of after-acquired personal property necessary to operation valid.**

   The rule of the New York courts, which governs the federal courts in dealing with local public utility corporations, is that a mortgage by such a corporation is valid in respect of after-acquired personal property necessary and appropriate for its physical operation under its franchises and the performance of its public duty.

2. **Gas ⬅8—Gas company mortgage, with after-acquired personal property clause, held to cover implements, materials, and supplies necessary for manufacture and distribution.**

   The after-acquired personal property clause in a mortgage given by a gas company to secure bonds *held* valid as to implements, tools, material, and supplies necessary and used in the manufacture and distribution of gas, but not to cover gas stoves and fixtures kept for sale to consumers.

3. **Gas ⬅8—Earnings of gas company prior to receivership held not subject to mortgage.**

   Under a provision of a mortgage by a gas company, giving it the right to the rents, income, and profits of its business until default, cash and accounts receivable in its possession at the time of a foreclosure receivership are not subject to the lien of the mortgage.

4. **Corporations ⬅566(I)—Deposits by consumers with gas company held entitled to priority on insolvency.**

   Deposits made by consumers with a gas company pursuant to a statute authorizing the company. to require such deposits before supplying gas, and providing that it shall pay interest thereon and refund the same, when the depositor, having paid in full, shall cease to be a consumer, *held* entitled to priority of payment on insolvency of the company.

5. **Corporations ⬅566(I)—Depositors with gas company for connections and extensions held general creditors.**

   Property owners, who made deposits with a gas company to cover the cost of making connections from main to curb, under agreements for refund of the deposits if and when they became consumers of gas, and others who made deposits to cover the cost of main extensions under agreements for refund in installments based on consumption of gas from the extensions, *held* general creditors of the company with contingent claims, and on its insolvency entitled to share in the assets on making proof, after due notice, that their claims had become payable.

6. **Equity ⬅429—Decree finally determining rights held not subject to change at subsequent term.**

   A decree, not appealed from, which definitely determined the status of the claim of an intervener against the estate of an insolvent corporation, *held* final, and not subject to review and change at a subsequent term.

7. **Corporations ⬅568—General claims against insolvent corporation entitled to interest to time of receivership.**

   General claims against the estate of an insolvent corporation are entitled to interest, to be computed to the time of appointment of receivers.

8. **Corporations ⬅565(I)—Mortgage trustee held entitled to prove as general creditor for deficiency.**

   The trustee in a corporation mortgage securing bonds *held* entitled to share as a general creditor, to the extent of its deficiency decree, in the unmortgaged assets of the corporation in insolvency, though at the time of appointment of receivers in a creditors' suit there had been no default under the mortgage.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Corporations ⟨⟩566(3)—Reorganization sale does not affect status of bondholders as general creditors for deficiency.**

The fact that the property of a corporation is sold under foreclosure pursuant to a reorganization plan, where the court fixes an upset price, affords no ground for preferring general unsecured creditors to mortgage bond creditors for a deficiency, in the unmortgaged assets.

Appeal from the District Court of the United States for the Western District of New York.

Suits in equity by the Pintsch Compressing Company and by the New York Trust Company, trustee, against the Buffalo Gas Company, in which George H. Church intervenes. Heard on cross-appeals. Decree modified.

Cross-appeals from a final decree of the District Court for the Western District of New York, entered May 9, 1921. One appeal is by George H. Church, intervener, and the other by William J. Judge, assignee of the purchaser at foreclosure sale.

Defendant Buffalo Gas Company is a New York public utilities corporation, and prior to September 24, 1914, was engaged in manufacturing and supplying manufactured gas to the city of Buffalo and consumers therein. On September 24, 1914, plaintiff Pintsch Company filed its bill in equity in the District Court, on behalf of itself and other creditors of the gas company, for the purpose of sequestrating the property of the company and applying the same to the payment of its debts. Jurisdiction was based on diversity of citizenship. On September 25, 1914, receivers were appointed to take possession of the franchises of the company, operate the same, wind up the business, convert the property into money, and, after the payment of the valid debts and obligations of the company, distribute the residue among the stockholders. On the same day, the receivers qualified and entered upon the discharge of their duties.

On April 15, 1915, New York Trust Company, as trustee, filed its bill against the gas company in the same court to foreclose two mortgages—one, dated October 1, 1897, given by Buffalo City Gas Company (consolidated with Buffalo Gas Company in July, 1899) to New York Security & Trust Company, as trustee, to secure $7.000,000 of bonds, of which $5,900,000 of bonds were subsequently issued; the other, dated October 17, 1899, given by Buffalo Gas Company to the same trustee as additional security for the $5,900,000 of bonds issued by Buffalo City Gas Company under the previous mortgage, and also to secure other bonds to be issued by Buffalo Gas Company in the amount of $1,-100,000, the latter mortgage being given pursuant to a consolidation agreement between Buffalo City Gas Company and Buffalo Gas Company.

On April 26, 1915, the foreclosure suit was consolidated with the sequestration suit, and an order was made extending the receivership in the sequestration suit to the mortgage foreclosure suit. On April 11, 1916, a decree of foreclosure and sale was entered, foreclosing these mortgages, and adjudging the amount due thereon to be $6,730,496.21. The decree directed the sale of the mortgaged property, subject to any liens for unpaid taxes or assessments which might have priority over the liens of the mortgages. On May 24, 1917, the decree of foreclosure was amended nunc pro tunc, so as to provide that the bids should be rejected unless the amount should be sufficient to make a distribution of 40 per cent. of the par value of the bonds. On July 16, 1917, the property was sold for the minimum amount fixed by the amended decree to one Gethoefer, who was the only bidder. This bid was afterwards assigned to Judge.

After the sale, but before confirmation, Church filed a petition asking leave to intervene for the purpose of establishing his rights as a creditor of the gas company. The application was granted, and Church's claim was referred to Franklin R. Brown, special master, to take proof and report. The major part of Church's claim is founded upon money loaned by him to the gas company and used by it for the purpose of paying the interest due upon its mort-

gage indebtedness on October 1, 1913, and April 1, 1914, the coupons being held by Church as collateral. These coupons are included in the amount found due by the foreclosure decree. Church's claim was liquidated and undisputed. In this petition Church asserted a lien upon the property of the gas company sold under the foreclosure decree, superior to the lien of the mortgages, upon the theory that the income of the gas company, which would otherwise have been available to pay the interest on the bonds, was diverted to make extensions and betterments, essential to enable the company to compete with natural gas, which extensions and betterments became subject to the lien of the mortgage and inured to the benefit of the bondholders.

Special Master Brown reported, in substance, that the gas company was indebted to Church in the sum of $243,550, principal (with interest to be added), for moneys loaned by him to the company; that Church held certain coupons as collateral security, and also had a secondary lien on $95,000 par value of the bonds of the gas company, which were pledged to a Buffalo bank as security for the note of $22,500 of the gas company, held by the bank; that Church subsequently purchased said note from the bank, and became entitled to the benefit of all of said bonds, so pledged, having acquired by purchase the interest of the bank therein, and thus having become subrogated to its rights. The special master reported against Church's claim to a lien superior to the mortgage upon the mortgaged property or proceeds thereof, and found that the detached coupons held by him were not entitled to share in the proceeds of the sale under the terms of the mortgage.

On September 11, 1917, an order was made and entered on September 25, 1917, confirming the report of Special Master Brown, but reserving for future determination the questions: (1) Whether the cash, materials, supplies, and accounts receivable in the hands of the receivers "were or were not covered by the mortgage in suit and sold under the decree of foreclosure"; and (2) whether Church had or had not an equitable lien "on such cash, materials, and supplies in the hands of such receivers." In the same order it was provided that leave was given to Church to file a supplemental petition, claiming an equitable lien upon cash, accounts receivable, and materials and supplies in the hands of the receivers, and claiming that the mortgages and the judgment of foreclosure did not constitute a lien upon such cash, accounts receivable, and materials and supplies, and that the issues raised by such supplemental petition were to be referred to a special master thereafter to be appointed.

On the same day an order was made confirming the report of the foreclosure sale, and providing, in effect, that upon carrying out his bid the special master should transfer and deliver to Gethoefer the foreclosed property, "reserving, however, the cash, materials, supplies, and accounts receivable then in the hands of such receivers, the right to which shall be determined by the court, when such receivers file their final account and apply for a discharge." It was provided that the purchaser could elect to give a bond conditioned that he would pay the value of the reserved property, "as fixed by the receivers as of the date of transfer," to whomever was finally determined to be entitled thereto, and that upon giving such a bond the reserved property should be transferred to the purchaser. All questions concerning the right to "the cash, accounts, bills receivable, and materials and supplies in the hands of the receivers" were reserved until the receivers finally accounted and applied for their discharge, and jurisdiction of the cause was retained until the final disposition of all reserved matters.

The purchaser elected to take over the materials and supplies, accounts, and bills receivable at the values fixed by the receivers, to wit, materials and supplies $123,443.72, and accounts and bills receivable $89,678.08 (as later corrected), and gave an appropriate bond to the receivers. No appeal was taken from either of the orders above mentioned. Thereafter the receivers applied for discharge, and on October 23, 1917, an order was made referring their account and all questions reserved in prior orders and decrees and arising out of Church's supplemental petition to George Clinton, Jr., as special master, to take proof and report as to who were entitled to share in the distribution of materials and supplies, accounts and bills receivable, and cash in the hands of the receivers, and in what priority and proportion.

Upon the hearing before Special Master Clinton, a controversy arose as to the scope of the words "materials and supplies" as used in the order; counsel for Judge claiming that those words were confined to specific materials and supplies carried under that heading in accounts of the gas company, and counsel for Church and for minority bondholders contending that these words should be interpreted as including all after-acquired personal property of the gas company not subject to the liens of the mortgages. A motion was made to amend the orders confirming the sale and the report of Special Master Brown and the order of reference to Special Master Clinton. The court in an opinion held that the words used—i. e., "materials and supplies"—were sufficiently comprehensive to include all after-acquired personal property, and the special master was required to take proof in respect of "meters in stock, horses, wagons, office furniture and fixtures, cars, and other personal property not attached to the freehold." In other words, the court construed its own language, which it had used in its own orders or decrees. The special master held that the materials and supplies, accounts and bills receivable covered by the purchaser's bond, and the cash were not subject to the mortgage, and did not pass on the foreclosure sale to the purchaser; that the bondholders, as to the part of their bonds remaining unsatisfied, were general creditors, entitled to share equally with other general creditors in the unmortgaged or "free" assets. These assets were ultimately found to consist of materials and supplies, $123,443.72; accounts receivable, $89,678.08; and cash, $80,086.32, making a total of $293,208.06.

There were three classes of deposits so called, representing money deposited with the gas company prior to the receivership, with which the special master also dealt. These were: (1) Consumers' deposits; (2) main to curb deposits; and (3) main extension deposits. As to the first class, the special master held that such deposits were entitled to priority of payment over all claims, except expenses of administration. As to the second and third classes, the special master held that such deposits were debts of the gas company, and the depositors were general creditors. The details in regard to these deposits will be referred to infra.

The special master found against Church's claim for an equitable lien on earnings, and held that his status was that of a general creditor. It was stipulated between the parties that the amount of Church's claim was $251,-629.97, with interest thereon from September 11, 1917. The special master found that the deficiency judgment in favor of New York Trust Company, as trustee for bondholders, was $4,638,049.48, with interest from July 16, 1917. The sole creditors were thus: (1) The trustee and (2) Church for the respective amounts above stated, and (3) the New York Central Railroad Company for a trifling claim of $7, with interest from November 1, 1916, unless the depositors, supra, were also creditors.

The special master, upon his theory of the case, failed to make any finding as to how much of the earnings of the gas company arose before and how much arose after the extension of the receivership to the foreclosure suit, and Church and Judge each excepted to the failure to make such finding. The reason why there are now only the creditors above noted is that all other claims existing prior to the sequestration receivership (aggregating $151,477.73) were paid by the receivers from time to time, pursuant to orders of the court from which there are no appeals.

Special Master Clinton took proof as to the meters in stock, horses, wagons. automobiles, fuel and lighting supplies, and other personal property which had not been included in the item of "materials and supplies" covered by the purchaser's bond, and reported the same without opinion. The court, in an opinion filed March 14, 1921, held that these items of personal property were required in the operation of the gas plant and were subject to the mortgage lien, but at the same time the court held that the cash, materials, supplies, and accounts receivable, aggregating $293,208.06, were not subject to the mortgage lien, and did not pass to the purchaser upon the foreclosure sale.

On the coming on of the motion for confirmation of Special Master Clinton's report, it was contended on behalf of Judge that Church was not entitled to receive any dividend on the $95.000 bonds referred to supra, on the ground that such payment would be equivalent to giving priority to the claim for

which the bonds were pledged. This contention was sustained by the District Judge. The decree, which confirmed the report of Special Master Clinton, as modified in accordance with the court's opinions, was entered May 9, 1921, and it is from this decree that the cross-appeals have been taken.

This decree provided, inter alia, as follows: That the receivers (not distinguishing between the sequestration and foreclosure receivers) were chargeable with the items of materials, accounts receivable, and cash aggregating $293,208.06, supra, plus any increment since Special Master Clinton's report, that Judge pay for the reserved materials and supplies $123,443.72, and accounts receivable $89,678.02, aggregating $213,121.74; that $18,938.77, being the amount of consumers' deposit made prior to the sequestration receivership, with interest from September 30, 1917, be paid into the registry of the court, for the benefit of the persons entitled thereto. After providing for the consumers' deposits and various expenses, it was decreed that the receivers should make pro rata distribution of the balance among the following creditors:

New York Trust Company, as trustee, with interest from July 16, 1917 ........................................................ $4,638,049.18
George H. Church, with interest from September 11, 1917 ....... 251,629.97
New York Central Railroad Company .......................... 7.00
Main to curb depositors ..................................... 40,192.50
Main extension depositors .................................. 3,171.02

In confirming the report of sale on September 11, 1917, the court had decreed that the trustee was entitled to a deficiency judgment for $4,638,049.48, being the difference between $6,998,049.48, the amount due as found by the foreclosure decree, with interest, and $2,360,000, the sale or purchase price, less $225,725, representing the detached coupons held by Church.

The questions presented by these appeals may be broadly stated as follows: (1) Did Church have the equitable lien which he claimed? (2) Of the items designated as (a) materials and supplies, (b) meters in stock, etc., (c) cash, and (d) accounts receivable, which are or are not "free" assets? (3) What is the status of the consumers' deposits, main to curb deposits, and main extension deposits? (4) What are the rights of Church in respect of dividends on the $95,000 bonds? 5) How and for what property shall the sequestration receivers and the foreclosure receivers respectively account, and what, therefore, shall be the plan of distribution?

Necessarily bound up with these questions are others which will be developed in the course of this opinion. For brevity, it will be understood that any reference to general creditors includes the railroad's claim of $7.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y. (Daniel J. Kenefick and Charles Pascal Franchot, both of Buffalo, N. Y., of counsel), for appellant Judge.

Moot, Sprague, Brownell & Marcy, of Buffalo, N. Y. (William L. Marcy and Helen Z. M. Rodgers, both of Buffalo, N. Y., of counsel), for appellant Church.

Locke, Babcock, Spratt & Hollister, of Buffalo, N. Y., for receivers.

Penney, Killeen & Nye, of Buffalo, N. Y., for appellee Steele.

H. J. Kelly, of Buffalo, N. Y., for appellee New York Cent. R. Co.

Spooner & Cotton, of New York City, for appellee New York Trust Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). 1. We agree with the conclusion of the District Court that Church is a general creditor and that the transactions between him and the gas company did not create an equitable lien in his favor on the earnings accruing prior to the extension of the receivership to the foreclosure suit, or

on the unmortgaged property. We place our decision primarily on the ground that the equitable lien contended for was not established by the evidence. It will not be profitable to analyze the facts nor the law applicable thereto, as this branch of the case was carefully and adequately dealt with in the reports of the special masters, which in this regard received the approval of the District Court.

2. (a) Materials and supplies; (b) meters in stock, etc. These two classes of items were separately considered, due to the fact that the existence of the items under (b) came to the attention of counsel and court after item (a) had been considered. Both classes of items, however, are governed by the same principles, and will be considered under the same heading. The point is raised by Judge that the decree of September 11, 1917, disposed of items under (b), and therefore that the court's order directing Special Master Clinton to take proof in respect of the items under (b) was too late, for the reason that the term had long since expired. The reservation in paragraph III of the decree of September 11, 1917, was that the right to "the cash, materials, supplies, and accounts receivable" should be determined by the court when the receivers filed their final accounts and applied for discharge. In view of this reservation, it was competent for the court at any time, at least up to the application by the receivers for their discharge, to construe the meaning of the words "materials and supplies," and thus to keep the question open notwithstanding the entry of prior orders or decrees. We are of opinion, therefore, that this branch of Church's appeal is properly here.

[1] The extent and nature of the lien of the mortgages is a question of local law. Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577. It is, of course, settled that the New York rule is that a mortgage of after-acquired personal property is ineffective as against creditors of the mortgagor, and some further act is necessary in order to make it an effective lien as against creditors. Zartman v. First National Bank, 189 N. Y. 267, 82 N. E. 127, 12 L. R. A. (N. S.) 1083; Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806. This general rule has been followed in this circuit. In re P. J. Sullivan Co., 254 Fed. 660, at page 662 et seq., 166 C. C. A. 158; Westinghouse, etc., v. B. R. T. (C. C. A.) 263 Fed. 532, at page 537 et seq.

But to this rule there is an exception in the case of public utility corporations. It has long been recognized that property of such corporations, necessary for purposes of operation, is constantly subject to change and additions. Such corporations perform a public duty. Gas companies manufacture and distribute a necessary of modern life. It is important, therefore, to maintain, if possible, continuous operation, even though property is sold under foreclosure or execution. It is realized that, owing to the large sums required to finance such enterprises, there must be sound security offered to those who invest in bonds secured by mortgages on properties of this character. It is essential for the security of such bonds that a mortgage shall safeguard the existence of a going plant at the time that sale is had under a foreclosure decree, to the end that the purchaser can continue to perform

the obligations of the franchises and, as in this case, furnish the public with the product for the manufacture and distribution of which the franchise was granted.

In Platt v. New York & Sea Beach R. Co., 9 App. Div. 87, 41 N. Y. Supp. 42, the court pointed out the reasons why the mortgage of a railroad company covered after-acquired personal property and announced a doctrine affected by the nature of the property and its relation to public duty and convenience. The opinion, in construing the effect of a particular statute, is not to be read as being confined to the purposes of that statute, but as, in addition, announcing important useful principles of general application to similar subject-matter. This case was affirmed by the New York Court of Appeals on the opinion below in 153 N. Y. 670, 48 N. E. 1106. There is, of course, nothing to the contrary in Platt v. New York & Sea Beach R. Co., 63 App. Div. 401, 71 N. Y. Supp. 913. Again, in New York Security Co. v. Saratoga Gas Co., 88 Hun, 569, 587, 588, 34 N. Y. Supp. 890, the court laid down similar rules in respect of the property of a gas company, pointing out, inter alia, that the doctrine applied, not merely to land and buildings, but to implements, tools, and machinery, and, in brief to whatever was "necessarily used in carrying on the business." This opinion is also illuminating, and was likewise affirmed on opinion below in 157 N. Y. 689, 51 N. E. 1092.

It is suggested that in some manner MacDonnell v. Buffalo L. T. & S. D. Co., 193 N. Y. 92, 85 N. E. 801, modifies the force and authority of the two cases just referred to. In the MacDonnell Case the court was dealing with a peculiar state of facts, and further the clause relating to various kinds of personal property was restricted to such as might be acquired not only after the execution of the mortgage, but also "after default shall be made herein." In the case at bar, as will presently appear, the after-acquired clauses did not contain any restriction to the effect that the after-acquired property mortgaged would only be such as might be acquired after default. Some expressions in the MacDonnell Case, which we need not pause to analyze at length, are at most dicta, and cannot be held to have changed the doctrine of the Platt and New York Security Co. Cases, supra. In the opinion of the New York Court of Appeals in the MacDonnell Case, no reference whatever is made to these two preceding cases, and such omission strongly confirms the view that the court did not intend to modify the principles which it had previously announced.

In Met. Trust Co. v. Dolgeville Electric Lt. & P. Co., 35 Misc. Rep. 467, 71 N. Y. Supp. 1055, the present Chief Judge of the New York Court of Appeals followed the New York Security Co. Case, 88 Hun. 569, 34 N. Y. Supp. 890, and held that the terms of a mortgage on an electric light and power company covered certain supplies consisting of wire still in the coils. In brief, we understand the New York rule to be that, in the case of a public utility corporation, a mortgage is valid in respect of after-acquired personal property necessary and appropriate for the physical operation of its franchises and the performance of its public duty.

The Buffalo Gas Company manufactured and distributed gas. To do so, it required necessarily, not only holders, mains, and other similar equipment, but tools, implements, and the materials for manufacture and distribution. In each of the mortgages, the after-acquired personal property sought to be brought under the lien was very fully described, as will appear from the extracts in the margin.[1]

Gas coal, gas oil, and similar materials are obviously necessary for the manufacture of gas, and just as much a part of the plant in operation as any machinery attached to the freehold. So, also, tools and implements are clearly necessary for purposes of operation, whether used in connection with manufacture or distribution. The test is not whether property of this character is physically attached to the freehold. Plainly, certain of such property, such as tools and implements, by their very nature, would not be physically attached to land or buildings, and coal and oil would necessarily be used up in the process of manufacture. The fact that such materials or supplies as are necessary for the manufacture and distribution of gas are kept on hand, instead of in some way being attached to the freehold, is immaterial in determining the lien of the mortgage, because with this class of mortgages there is no reason why such necessary materials and supplies may not, as against general creditors, be covered by the mortgage, and every reason to the contrary.

[2] Applying these principles, we will examine the details listed in Exhibit 12. The items under the headings of gas, coal, oil, oxide, tar, and the like, aggregating $60,627.51, passed to the purchaser, and should not have been held to be unmortgaged assets. This is also true,

[1] Mortgage of 1897: "All and singular its personal property, its gas works, plants, and machinery for making, generating, and supplying gas, its service and other pipes, holders, mains, meters, purifiers, generators, cocks, tools, implements, and all apparatus, services, connections, fixtures, appurtenances, licenses, contracts, and agreements, and patented or other processes for making and distributing, gas now owned or which shall hereafter be acquired by the gas company, all of which personal property is hereby declared to be fixtures and appurtenances of said gas works and plants and parts of the same, but the particular description of personal property herein contained shall not be construed to exclude any other personal property which now belongs to or which may hereafter be acquired by the gas company, and also all improvements, additions made or to be made to said plants and properties, real and personal, and all replacements of the same or the appurtenances thereof, and also all and every other estate, right, and interest, privilege, and franchise, corporate or mixed, which the gas company now owns or holds, or may or shall hereafter acquire, own, or hold."

Mortgage of 1899: "All and singular its supplies of every name, nature, and description, * * * and all and singular the moneys, book accounts, bills receivable, and other property of every name, nature, and description, which have been or which shall hereafter be acquired by the party of the first part, whatever the particular description thereof shall be, * * * and also all and singular its personal property, plants and machinery for making, generating, and supplying gas, its service and other pipes, holders, mains, meters, purifiers, generators, tools, implements, and all apparatus, services, connections, fixtures, licenses, contracts, and agreements, now owned or which shall hereafter be acquired by the gas company, all of which personal property is hereby declared to be fixtures and appurtenances of said gas works and plants and parts of the same."

in the main, in respect of the item of $53,620.60 called "general materials and supplies (pipes, fittings, tools, etc., also lamps and portables)." It was testified by Humphreys, one of the receivers, and by Meyers, who seemed thoroughly familiar with the affairs of the gas company, that the coal, oil, etc., represented a reasonable amount to have on hand for the operation of the plant, and that "generally materials and supplies on hand were the materials and supplies in the way of pipes, fittings, tools, and things of that character used in connection with the everyday operation of the plant, and that was a reasonable account." Humphreys, one of the receivers, testified, however, that "portables" are the portable fixtures for lighting, sold by the gas company, for the purpose of pushing its business, and it may be that "lamps" are in the same category. The evidence is not clear as to "lamps."

The "gas stove stock," representing an item of $9,195.65, is on the same basis as portables. That item referred to a stock of gas stoves kept on sale to encourage the use of gas. Such articles were not necessary for the manufacture or distribution of gas, and must be regarded merely as merchandise, used to promote the sale of gas, but in no sense necessary to the operation of the plant. Such merchandise was not subject to the mortgage, and therefore the purchaser was not entitled to this item. As we are not advised as to the value of the "portables," or as to the nature or value of the "lamps," included in the item "general materials and supplies," we are unable to state the result in figures, and must remit that detail to the District Court.

In view of the foregoing, it is apparent that the District Court rightly decided that the items under (b), consisting of meters in stock, horses, automobiles, stable equipment, tools, etc., were subject to the mortgage lien, and passed to the purchaser, except the item of $2,847 for "fuel and lighting appliances." We gather from the testimony of Meyers and from Exhibit 19 that "fuel and lighting appliances" consisted of articles for rent or for sale, which were connected on consumers' premises, but not necessary to manufacture and distribution.

To summarize: Judge is entitled to all the articles under (a), except portables, gas stove stock, and possibly lamps, and to all under (b), except "fuel and lighting appliances." Under his bond, he must make payment to the receivers of $9,195.65 for the gas stove stock, and whatever may prove to be the value of the "portables," and possibly the "lamps," as of September 30, 1917. He must also make payment of $2,847 for "fuel and lighting appliances."

[3] 3. Cash and Accounts Receivable. The 1897 mortgage contained the following provisions:

"Until the gas company shall have made default in the payment of the principal or interest of any of the bonds hereby secured, or intended so to be, or in the performance of the covenants, or any of them, herein expressed to be kept and performed by the gas company, it shall have the possession, use, enjoyment, and control of all the property and franchises covered by this mortgage, with the appurtenances, and shall receive the rents, issues, income and profits thereof. * * *"

A similar provision was incorporated in the 1899 mortgage. In such a case, cash and accounts receivable existent prior to a mortgage fore-

closure receivership, and at that time not in the possession of the mortgagee, are not subject to the lien of the mortgage. The rule applies to public utility as well as to other classes of corporations. N. Y. Security Co. v. Saratoga G. & El. Co., 159 N. Y. 137, 53 N. E. 758, 45 L. R. A. 132; Gilman et al. v. Ill. & Miss. Telegraph Co., 91 U. S. 603, 23 L. Ed. 405; American Bridge Co. v. Heidelbach, 94 U. S. 798, 24 L. Ed. 144; Atlantic Trust Co. v. Dana, 128 Fed. 209, 62 C. C. A. 657; Platt v. New York & Sea Beach R. Co., 170 N. Y. 451, 457, 63 N. E. 532; Central Trust Co. v. Morton Trust Co., 200 N. Y. 577, 93 N. E. 975.

Whether the mortgage lien in respect of "rents, issues, income and profits" of the property and franchises covered by the mortgage attached at the date of filing the foreclosure bill, or at the date of the foreclosure receivership, is a question concerning which decisions are not in harmony. We need not however, determine this question, for the reason that, for purposes of convenient accounting, the litigants seem to have agreed on April 30, 1915, as the foreclosure receivership date. Thus, on April 30, 1915, the unmortgaged assets in the hands of the sequestration receivers, to the exclusion of the foreclosure receivers, consisted of certain materials and supplies, accounts receivable and cash in amounts to be referred to infra. Later there was received a refund for taxes, to which we shall also refer infra.

4. Creditors. There has been no separate accounting of the sequestration receivers, and no attempt to determine how much of the fund now awaiting distribution shall be credited, respectively, to the sequestration and the foreclosure receiverships. It is, of course, also necessary to ascertain who are the creditors. By reason of the course which the actual administration of these receiverships has taken, Church, the railroad, and the trustee are the only creditors remaining whose claims arose because of transactions prior to receiverships, unless the depositors are also creditors. The deposits are of three classes:

[4] (a) Consumers' Deposits Made Prior to September 24, 1914, Where the Depositors have Ceased to be Consumers. These were authorized under section 63 of the New York Transportation Corporations Law (Consol. Laws, c. 63), quoted in the margin.[2] The gas company availed of its right under the statute to demand a deposit as a condition of supplying gas to the consumer, and gave a receipt reading:

"It is hereby expressly agreed between the Buffalo Gas Company and the said depositor that this deposit shall be subject to the deduction of any indebtedness due from depositor to said company. Upon full payment of any such indebtedness, and return of this certificate, the said Buffalo Gas Company agrees to refund said deposit, with interest. Interest ceases on the day depositor ceases to be a consumer."

---

[2] "Every gaslight * * * corporation may require every person to whom such corporation shall supply gas * * * to deposit with such corporation a reasonable sum of money * * * as security for the payment of the gas * * * rent or compensation for gas consumed, * * * to become due to the corporation, but every corporation shall allow and pay to every such depositor legal interest on the sum deposited for the time his deposit shall remain with the corporation."

The District Court held that these claims were entitled to priority. Church contends that these are general creditors' claims not so entitled. The basis of this contention is that the deposits do not constitute a trust fund, and that the relation of debtor and creditor is set up, as evidenced by the requirement as to interest. The relation of debtor and creditor, however, must be created by voluntary agreement, express or implied. Here the consumer has no choice (Hewsey v. Queens Borough Gas & El. Co., 47 Misc. Rep. 375, 93 N. Y. Supp. 1114), for, before he can obtain gas, he is compelled to make a deposit "as security." On the other hand, the requirement of the statute that the gas companies shall pay interest is some support for the contention that such corporations are authorized not to treat the deposits as inactive moneys, but to use them in their business, and hence to mix these deposits with general funds. Thus the case is sui generis.

Although the depositor has been lawfully compelled to deposit security, yet the corporation seemingly may so use the deposit as to deprive it of some of the characteristics of a trust fund. Thus the status of the deposit is different, on the one hand, from that of security for rent given as part of an agreement between landlord and tenant, as in In re Banner (D. C.) 149 Fed. 936, and, on the other, from that of property which may be reclaimed only if it or its proceeds can be traced, as instanced in In re J. C. Wilson & Co. (D. C.) 252 Fed. 631. Courts of equity have marshaled assets and assigned priorities in response to equitable requirements and business necessity, as is illustrated by the now well-established principle that preference will be accorded to claims for materials and supplies furnished to public utilities for current operation within a limited period prior to receivership. The fact that, because of statutory permission, such deposits are not made as the result of voluntary agreement, but compulsorily required as a condition of supplying gas, is sufficient to justify a court of equity in treating them as preferred claims.

[5] (b) The Main to Curb Deposits. These were made under section 288 of the old Buffalo City Charter, embodied in section 144 of the present City Charter, providing that the city may make connections from the gas company's mains in the street to the curb line, and then assess the cost upon the premises to which the connections are made. By virtue of certain contracts, the gas company did the work and was paid by the city, which in turn imposed the assessment. The gas company agreed with the city to refund the cost of the connection to the owner of the premises, if and when he should become a gas consumer. In some instances the property owner directly requested the gas company to make connections, and the gas company required him to deposit the estimated cost, and gave him a receipt, agreeing to refund the deposit when the service of gas actually commenced. These deposits do not carry interest. Meyers testified that some of these property owners did not begin to use gas until many years after the connections were made, "frequently 10 to 15 years and 18 to 20 years"; the oldest deposit on hand having been made in 1873. These deposits were used—and properly so—as a part of the general funds of the gas company. These depositors thus had contingent claims, certain as to amount, but

not ripened, because the contingency or condition upon which refund would be made—i. e., becoming consumers—had not occurred. They must be regarded as general creditors, whose rights can only be cut off as indicated infra.

(c) Main Extension Deposits. These deposits, without interest, were made under rules duly approved by the Public Service Commission, which provided that, in case the gas company deemed it inexpedient to extend a gas main at its own expense, it could require the applicant for the extension to make an advance deposit to cover the estimated cost, the gas company, agreeing to refund the deposit in certain installments, based on the consumption of gas resulting from the extension. These deposits are in the same position as the main to curb deposits.

[6] 5. Church's $95,000 Bonds. In the original decree of foreclosure, dated April 11, 1916, the status of these bonds was determined. Church had not intervened at that time, and the amount of the debts secured by these bonds was therefore, as yet, undetermined; but this was one of the subjects dealt with by Special Master Brown. He found that Church was entitled to a lien upon these bonds to secure the amounts advanced by him to the gas company. In the decree confirming the special master's report, dated September 11, 1917, and entered September 25, 1917, the court fixed the net amount of Church's claim at $251,629.97, which sum was arrived at after deducting from the face of the claim, with interest to September 11, 1917, the payment of 40 per cent. on the $95,000 bonds, amounting to $38,000, out of the proceeds of sale of the mortgaged property. Paragraph V of the decree provided as noted in the margin.[3] This was a final decree which adjudicated the rights of the parties in respect of this particular subject-matter, and thus the time to appeal began to run from September 25, 1917, the date of entry. Long after the term had expired, and the time within which to appeal had likewise expired, the court held that Church should not participate in the distribution of the dividend to the trustee, as the holder of the deficiency judgment, and so provided in paragraph twelfth of the decree, dated May 9, 1921, now under review.

It is urged that the basis of the decree of September 11, 1917, was that Church should have the right to realize upon these bonds, through the deficiency judgment, only if that judgment obtained "a priority of any kind." We need not determine this, nor the contrary contention. The adjudication of September 11, 1917, was clear, and, the term hav-

---

[3] "V. The defendant, Buffalo Gas Company, is indebted to the intervener, Church, upon a note made by the said gas company and now held by said Church, in the sum of $22,500 and interest thereon from September 1, 1917, and the said Church has a lien upon $95,000 par value of the first mortgage 5 per cent. 50 year gold bonds of the Buffalo City Gas Company, first as security for the payment of said note and interest, and next as security for the indebtedness set out in paragraph IV, and said Church is entitled to share in the proceeds of the sale of the mortgaged property to an amount equivalent to 40 per cent. of the par value of said $95,000 of bonds by reason of such liens, and to any further sum that may be realized upon said $95,000 of bonds through the deficiency judgment recovered herein by the New York Trust Company against said Buffalo Gas Company."

ing expired, the District Court was without power to modify the 1917 decree in this regard, as it attempted in paragraph twelfth of the May 9, 1921, decree. This part of the decree must therefore be reversed, and paragraph V of the decree of September 11, 1917, must be followed.

6. The Accounting. Owing to the method of administration and the failure to state separate accounts for the sequestration and foreclosure receiverships, respectively, it is impossible for us to set up the figures of these accounts. We shall endeavor, however, to state the principles involved.

The sequestration and foreclosure receiverships are separate, but may, as matter of practical administration, run concurrently until the whole estate is wound up. This is because the sequestration receivership has possession of the unmortgaged assets, which, for accounting purposes, do not at any time go into the possession of the foreclosure receivers. Primarily the fund of the sequestration receivership is made up of the unmortgaged property on hand when the receivers take possession, whether physical property or accounts receivable and the like. At the conclusion of the sequestration receivership, this fund may be larger or smaller, dependent upon the results of the operation of the sequestration receivership. To illustrate, with arbitrary figures: At the inception of a receivership, there may be cash on hand $50,000, accounts receivable $50,000, and unmortgaged property worth $50,000, thus making an apparent total of $150,000. Assuming that the receivers continue business and are successful in increasing the value of the estate, they may have at the conclusion of their operation cash $100,000; the accounts receivable due prior to the receivership may have been collected to the extent of $40,000, and $20,000 may be due from purchasers and customers on good accounts receivable developed during the operation. Unmortgaged personal property, including pre-receivership unmortgaged personal property, and such as may have been purchased by the receivers in the course of their operation, may amount to $60,000. The total would be $220,000. On the other hand, the receivership operation may have resulted in a loss, leaving on hand, say, only $50,000. It is the fund of $220,000 or $50,000, as the case may be, which is to be distributed in accordance with well-settled principles and practice. First, there must be paid the expenses of administration, then the debts incurred by the receivers for their operation. The balance is the fund distributable among preferred and general creditors. Out of such balance, there must be first paid the claims of preferred creditors, principal and interest, and the remaining sum, if any, constitutes the fund available for distribution to general creditors.

In the case at bar there is a statement, known as Exhibit 6, purporting to show assets and liabilities as of September 24, 1914, the date of filing the sequestration bill, April 30, 1915, the convenient date marking the commencement of the foreclosure receivership, and September 30, 1917, the date of the transfer to Judge, as a result of the sale under foreclosure. This exhibit may be useful for bookkeeping purposes, but is not to be taken as stating the account either of the sequestration or of the foreclosure receivership. The matter is further com-

plicated by the payment during administration of $151,477.73 in settlement of claims against the corporation existing prior to the sequestration receivership. The parties have stipulated that these amounts "were paid by the receivers during the receivership"; but, although it is stated by counsel that these amounts were paid by the foreclosure receivers, the record does not fully enlighten us as to what funds, if any, of either or both receiverships were used for this purpose. When the foreclosure receivers took possession, the sequestration receivers had in hand cash to the amount of $152,105.84, and this sum seems to have been turned over to the foreclosure receivers and utilized by them to pay off some pre-foreclosure receivership debts, and also utilized in connection with the operation of the plant by the foreclosure administration. The difficulty now presented is the determination of which of these debts, if any, should be paid by the sequestration receivership. We have not overlooked the provisions of the stipulation (appearing at pages 332 et seq. of the record), but these do not give us adequate information. Besides, while some of these items were preferred claims and others not, there still remain some the status of which is not clear. In view of the form which the record has taken in this case, we have concluded that these payments should be disregarded in the account, as the claimants are no longer creditors.

Applying the principle, supra, to the case at bar, the sequestration receivers at the conclusion of their receivership had in hand materials and supplies in the amount set forth in 2 (a) and (b) supra, cash to the extent of $152,105.84 and accounts and bills receivable. To arrive at this last item, it must be ascertained what accounts and bills receivable outstanding on April 30, 1915, were ultimately collected. The amount set forth in Exhibit 6 is roughly $87,600, less about $8,600 reserved as of April 30, 1915, for bad debts. By this time the receivers must know the exact figure for these items of accounts and bills receivable. To the foregoing must be added an item of $4,808.86 due to the following circumstances: In December, 1919, the receivers made an adjustment with the city of Buffalo on account of franchise taxes for the years 1912, 1915, and 1916, as a result of which they received a net refund of $11,066.16. This refund does not appear on Exhibit 6, because made after the date of that statement. Of this net refund, $4,808.86 was for the year 1912. Having thus ascertained the gross fund in hand, it is next necessary to determine who are the creditors entitled to share in this fund, and how the amount of their claims shall be ascertained.

There is an item in Exhibit 6 entitled "Trade and Other Acts." The pre-receivership claims of this character were paid, as above stated. It is also apparent that any of these obligations which may have been incurred by the sequestration receivers were also paid, so that there are now no creditors of this class. There was an item for current taxes which we assume were governmental in personam taxes against the corporation and the sequestration receivership. The record is not clear as to whether or when these taxes were paid, and this we must leave to be dealt with by the District Court. There is an item for city taxes for 1913 and 1914. The purchaser at foreclosure sale bought

subject to these taxes. They are no longer a debt, as Judge has settled with the city. In view of the fact that there was no appeal from this disposition, these taxes are no longer a claim, and, for purposes of accounting in this particular case, will be disregarded. The item of "Interest on Unfunded Debt" refers to interest on the Church coupons and on the consumers' deposits. The interest on the Church coupons is necessarily a part of his claim as a general creditor, and the interest on the consumers' deposits is part of the preferred claim of the consumers, to the extent indicated infra.

The foregoing analysis leaves as creditors sharing in the balance in the hands of the sequestration receivers, after payment of expenses of administration and debts incurred during receivership operation, and possibly current taxes: (1) Consumer depositors as preferred claimants; (2) the other two classes of depositors, and Church and the trustee as general creditors. In respect of all the three classes of depositors, there has as yet been no notice to file claims. The publication of such a notice was recommended by the special master and approved by the court, and it was ordered that funds to meet these claims should be deposited in the registry of the court. Such funds, however, should not be so deposited to remain there indefinitely. Persons who have made deposits and have ceased to be consumers should be required by appropriate notice to file their claims, and, failing so to do, all claims should be cut off which are not filed within the time indicated by the notice. The other two classes of depositors are entitled to share as general creditors, without interest, only if they have become consumers. They may never become consumers, and their claims should be similarly cut off by the same procedure as to notice. The procedure has been fully described in Pennsylvania Steel Co. et al. v. New York City Ry. Co. et al., 198 Fed. 721, 735, 117 C. C. A. 503, where, per Judge Noyes, this court laid down the rule in respect of proving claims.

[7, 8] In regard to those claims which bear interest, the controlling authority is American Iron Co. v. Seaboard Air Line, 233 U. S. 261, 34 Sup. Ct. 502, 58 L. Ed. 949. See also Pennsylvania Steel Co. v. New York City Ry. Co., 216 Fed. 458, at page 471, 132 C. C. A. 518. As, in the case at bar, it is apparent that the claims of creditors cannot be paid in full, interest on the principal will run to September 24, 1914, on the amount at that time due on the consumers' deposits and on Church's claim.

There is thus left in this connection only the question of the status of the trustee's deficiency judgment. The contention of Church is that the appointment of the sequestration receivers constituted an equitable lien in favor of the creditors then existing, and that, as the bonds were not then in default, they were not entitled to share in the fund of the sequestration receivership. An examination of the certified question in the Saratoga Gas Co. Case will show that all that was decided by the court was that the foreclosure receiver had no prior right to "the debts and accounts due to the corporation upon sales by it of products of its plant produced after the giving of the mortgage and before the appointment of either receiver." As the receivers in that case

were appointed contemporaneously, the application of the Saratoga Gas Co. Case to the case at bar is that the foreclosure receivers had no prior right to the pre-receivership debts and accounts due to the corporation.

The answer to the contention of Church is that in this circuit the rule as to the times of ascertaining provable claims against an insolvent estate is as stated by Judge Noyes in the Penn. Steel Co. Case, supra. The claim on the bonds is within the class described by Judge Noyes at page 738 of his opinion (198 Fed. 738, 117 C. C. A. 520) as "claims which at that time are certain, but which are not matured." Such claims are clearly provable, because "the right of a creditor to participate in the assets of an insolvent estate—a right in rem, and not in personam—is not dependent upon the existence of an accrued cause of action at the time of the receivership." This subject was considered in the Metropolitan Street Railway receivership by the late William L. Turner, a special master highly experienced in this class of litigation. In the receivership record in Pennsylvania Steel Co. v. Metropolitan Street Railway Co. (volume 32, p. 645), Mr. Turner held:

"The claimant trustee under the two Metropolitan mortgages have an unquestionable right under the authorities, federal and state, to prove claims to the extent of the face value of bonds secured, against general assets of the insolvent Metropolitan Company, subject only to the limitation that the amount of the deficiency decrees to be hereafter entered will suggest a maximum amount to be paid on the claims allowed. Merrill v. Bank of Jacksonville, 173 U. S. 131; People v. Remington, 121 N. Y. 328; Matter of Simpson, 36 App. Div. 562."

This was affirmed by Judge Lacombe on the special master's opinion. See page 763 of volume 32, supra. In addition to the cases cited by Special Master Turner, see Chemical Nat. Bank v. Armstrong, 59 Fed. 372, 8 C. C. A. 155, 28 L. R. A. 231; Merchants' Nat. Bank. v. Flippen, 158 N. C. 334, 74 S. E. 101; Matter of Bates, 118 Ill. 524, 9 N. E. 257, 59 Am. Rep. 383; Third National Bank v. Haug, 82 Mich. 607, 47 N. W. 33, 11 L. R. A. 327; Detroit Trust Co. v. State Bank of Michigan, 150 Mich. 530, 114 N. W. 327. Judge Dietrich also recognized this principle in a careful discussion in Westinghouse Elec. & Mfg. Co. v. Idaho Ry. L. & P. Co. (D. C.) 228 Fed. 972, but held otherwise in view of certain provisions of an Idaho statute.

As the trustee has not appealed, we need not be concerned with proof of the whole amount of debt due on the bonds as of the time of the appointment of the sequestration receivers, but it will suffice for the purposes of this case (and we limit our decision to this case) that the trustee may come in as a general creditor to the extent of the deficiency, with interest figured however only up to September 24, 1914.

To summarize: The general creditors entitled to share in the balance in the hands of the sequestration receivers, after payment of expenses of administration, receivers' obligations, and preferred claims, are Church, the trustee, and the two classes of depositors, interest on the preferred claims of consumers and on Church's claim and on the trustee's claim to be calculated as of September 24, 1914. After April 30, 1915, the foreclosure receivers, under familiar and accepted principles, were entitled to the net income, if any, produced by their

operation. If the figures work out so as to leave any fund in the hands of the foreclosure receivers, such fund, as well as the proceeds of sale of the mortgaged property, was solely available to pay the bond indebtedness up to the point where that debt would be satisfied, and obviously in this case, as such debt cannot be satisfied, there is no fund arising out of the foreclosure receivership in which the general creditors share. Illinois Trust & Savings Bank v. Doud et al., 105 Fed. 123, 44 C. C. A. 389, 52 L. R. A. 481.

[9] In view of some observations at the conclusion of the opinion in the Saratoga Gas Co. Case, it is urged that there is a distinction between a case in which property is sold under foreclosure pursuant to a reorganization plan and a case in which property is bid for in an open market. We recognize that, in nearly every case of a corporation as large as the defendant, a foreclosure sale is had in connection with a plan for reorganization, although in the case at bar no such plan is before us. There is not, however, any legal reason for preferring general unsecured creditors to mortgage bond creditors in such a case. The court fixes the upset price in the exercise of its sound discretion, with the entire situation before it, and such price necessarily determines the deficiency. On principle and under the cases cited, the claims of mortgage bond creditors or the trustee are neither higher nor lower in equity than those of general creditors.

From the foregoing, it is apparent that the decree must be modified, and the cause returned to the District Court, with instructions to take such further proceedings as may not be inconsistent with this opinion.

Decree modified, without costs.