## ROCKWELL v. NEW YORK UNITED HOTELS, Inc.*

### DONAHUE v. HOWE et al.

### No. 216.

Circuit Court of Appeals, Second Circuit.
July 22, 1935.

Daniel F. Cohalan, of New York City (David W. Kahn, of New York City, of counsel), for appellant.

Loucks & Cullen, Baldwin, Hutchins & Todd, and Graham, McMahon, Buell & Knox, all of New York City (Edward Ward McMahon and William H. Hall, both of New York City, and Hugh M. Morris, of Wilmington, Del., of counsel), for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The two decrees from which these appeals were taken were entered in a winding up suit, ancillary to an original shareholders' suit brought in Delaware, the state of the defendant's incorporation. The bill alleged that a plan of readjustment had been propounded by the defendant, which though solvent in the sense of the Bankruptcy Act (11 USCA), was insolvent in that it was unable to pay its obligations in due course; and that there was danger that the assets might be wasted in proceedings instituted by creditors. It prayed that receivers be appointed and that eventually the property should be sold out and distributed. Receivers were appointed and the property was sold at public auction, and bought in by a new reorganized company,

*Writ of certiorari denied 56 S. Ct. 309, 80 L. Ed. —.

called Roosevelt Hotel, Inc. This sale was confirmed by a decree, from which one of the two appeals was taken. Donahue, a creditor holding $50,000 of debenture bonds, petitioned for leave to sue the defendant and issue execution against its assets. The second decree appealed from denied this petition.

The facts out of which the controversy arose were as follows: On August 1, 1922, the New York State Realty & Terminal Co., a subsidiary and lessee of the New York Central Railroad, the owner of the fee, leased to the defendant a plot of ground in New York, for twenty years with renewals, as the site of a proposed hotel. The lessor agreed to lend to the defendant $3,000,000 towards the venture and on December 1, 1923, the defendant borrowed about $3,500,000 more through an issue of first mortgage 7% bonds; there were already outstanding 42,000 shares of 7% preferred stock and 65,000 shares of common. The hotel was put up and equipped and for a while ran at a profit; so that on June 1, 1927, the defendant was able to refund the mortgage bonds by an issue of $5,300,000 6% debentures, of which Donahue's bonds are a part. These bonds recited that they were "all issued and to be issued under an indenture * * * made * * * between the company and the Central Union Trust Company, New York, trustee, to which indenture reference is hereby made for a statement of the terms upon which said debentures have been issued." By section 9, article 6, of that indenture, the defendant covenanted "that it holds the premises * * * and the fixtures and equipment therein as lessee under a good and valid lease dated August 1, 1922 * * * the company covenants that all real estate and other property * * * owned by the company including its leasehold interest under the main lease at the date of actual execution hereof is free and clear of all mortgages * * * pledges, incumbrances and other liens" except, first, that the lessor is lessee from the New York Central Railroad; second, that the term is subject to a mortgage by the lessor to secure $2,500,000 of bonds; and, third, that it is further subject to the lessee's 7% mortgage just mentioned. The lease gave the lessor the usual rights of re-entry upon default, and provided in article 12 that "in case of the termination of this lease * * * there shall also be surrendered to the lessor at the time of such termination

all equipment * * * in the demised premises * * * all of which in that event are hereby assigned and transferred absolutely to the lessor, but said furnishings * * * shall be sold by the lessor at public or private sale as to it shall seem advisable, and any excess in the sale price over the aggregate of the sums owing from the lessee and of the damage suffered by the lessor by reason of the default of the lessee, shall be accounted for by the lessor to the lessee."

By December, 1931, the defendant had fallen heavily into arrears for rents, and the lessor had served it with a notice to quit. To avoid ejectment the first plan of readjustment was drawn up on December eighth of that year; by it a delay of two years was obtained, but without result for the business became steadily worse. The bill at bar was filed on December 15, 1933, by which time the defendant was in default for over $1,200,000 of rental and taxes and $450,000 more of sinking fund advances. Its other debts were the principal of the 6% debentures—somewhat over $5,000,000 —and merchandise creditors of a little less than $50,000. A committee of debenture holders then proposed the second plan of reorganization, whose confirmation is before us now. The substance of this was as follows: A new company was to be organized to operate the hotel under a new lease from the former lessor. This company should issue debentures, and preferred and common shares. The holders of the old debentures might buy the new bonds at par up to one per cent. of their holdings, and if they did, would receive as bonus five shares of preferred and a voting trust certificate for five shares of common in the new company. Those debenture holders who did not buy new bonds would get a voting trust certificate for two and a half shares of common stock. The preferred shareholders of the debtor had an option to buy five dollars of the new bonds for each ten shares of the preferred, and would receive as a bonus, five voting trust certificates of the new common. Those who did not subscribe to the new bonds would get nothing. The lessor would lease the land to the new company at the old rent, and receive in new bonds the face of its claims —rents and taxes paid, but not the unpaid amortization charges. To secure future rents it was to have a chattel mortgage on all the furniture. Merchandise creditors would be paid in full.

After this plan had been proposed and assented to by a very large proportion of the debenture holders, the judge directed the property to be sold with an upset price of $25,000. The new company bid in the property, but upon confirmation the judge changed the terms by excluding all cash on hand and accounts receivable from the property sold, and by requiring the new company to assume the merchandise debts. Donahue, then speaking for $112,000 of the debentures, protested; he insisted that the plan was unfair, especially because the lessor was treated as though it had a valid lien upon the furniture, there being no other ground for its receiving such an unequal share of the new bonds. The judge heard evidence which developed that the term, including the building, had no value at all standing by itself, but that the furniture if taken out and sold separately was worth $215,000 and had a value in situ of $944,000. He directed that five dollars should be paid on each bond, passed the receivers' accounts and confirmed the sale. He also denied Donahue's motion for leave to sue.

It is apparent at once that if the furniture was in fact subject to the lessor's claims for rent as the lease provided, the creditors have no complaint. In that event the unescapable fact was that the company's property was encumbered beyond any possibility of salvage for the debenture holders. The term itself was subject to condition of re-entry and with all the fixtures lay in the lessor's pleasure; there was nothing but the mortgaged furniture, and if the lessor chose ex gratia to yield anything at all, it was manna to the creditors, who could have been incontinently turned out of doors. It is true that the merchandise creditors are to be paid in full, but the excuse is that their good will is important if the business is to continue, and so far as we can see, this may be true. The item is a small one in any event amid such substantial figures. Thus the dispute has centered, as it must, on the rights of the lessor in the furniture. To a discussion of this we confine ourselves.

■ The lessor's rights in the furniture were infirm for two reasons; as a chattel mortgage the lease was not filed and all the furniture was after-acquired property. In both aspects it was void against creditors, and at least since Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885, this has been true as well for general

as for execution creditors. In re Gerstman, 157 F. 549 (C. C. A. 2). In re New York Economical Printing Co., 110 F. 514 (C. C. A. 2), has been overruled and we have twice said, though we have not held, that a receiver like the receivers here could invoke the remedies of execution creditors. Westinghouse E. Co. v. Brooklyn R. T. Co., 263 F. 532 (C. C. A. 2); Pintsch Compressing Co. v. Buffalo Gas Co., 280 F. 830, 835 (C. C. A. 2). However, like any other remedy creditors may agree to yield their power to attack such a mortgage; and here they have done so. The recital in the debentures which we have quoted charged the holders with whatever that document contained. McClure v. Oxford Twp., 94 U. S. 429, 24 L. Ed. 129; Babbitt v. Read, 236 F. 42 (C. C. A. 2); National Salt Co. v. Ingraham, 122 F. 40 (C. C. A. 2); McClelland v. Norfolk, etc., R. Co., 110 N. Y. 469, 18 N. E. 237, 1 L. R. A. 299, 6 Am. St. Rep. 397. It is true that it did not declare that the furniture was subject to the actual covenant of the lease; had it done so, no controversy would have been possible, whether that created an invalid mortgage or not. Apparently because the draughtsman supposed that there was no difference between the lessee's interest in furniture that was permanently fixed to the realty and what was not, the indenture described the interest in the same terms, and in the same as the lessee's interest in the realty. In short the trustee accepted a term for years in all the furniture. Such an interest was less than what the defendant actually had; a mere term was subject to right of re-entry like the term in the realty, and after re-entry the defendant would have had no further interest of any kind. But under the covenant in the lease although the lessor could seize the furniture, it was bound to sell it and pay over any surplus to the lessee. Of course the covenant was not recited as a lien; it could not have been, consistently with the title as it was actually described. The doctrine on which the invalidity of such mortgages depends is throughout equitable; it stands upon the injustice of allowing the mortgagor to enjoy a fictitious credit through his ostensible ownership. If the creditor who is the wronged party has accepted a position even worse than that which the mortgage gives him, it would be to the last degree unjust to allow him to challenge it because it was not filed, or because it affected property not yet in existence. The creditors here got more than

they ever bargained for; and the plan of reorganization was not only fair, but generous to those who in truth had no longer a shred of interest in the property.

It is therefore unnecessary to resort to the stipulation appearing in the record. Its purport is that the debentures were made expressly subject to all the conditions in the lease; which may mean either that the documents are to be so construed, or that there was evidence, documentary or other, which charged the holders. Perhaps if it were construed in the first sense we should have to disregard it as an attempt in effect to stipulate what was the legal effect of a series of documents. It need not be so read; preferably it should not be; it professes to be, not an interpretation, but a statement that there are agreements which "expressly," that is, in so many words, made the debentures subject to the lease. Perhaps there were none such, but the stipulation stands unimpeached. The issue is not indeed critical, but we do not wish sub silentio to let it be assumed that we will countenance an effort to disregard formal engagements unless the party who wishes to be relieved moves to that end upon adequate grounds.

Decrees affirmed.